# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JHAVE'LL MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 6108** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **CITY OF CHICAGO, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Jhave'll Moore ("Plaintiff") brings this action under 42 U.S.C. § 1983 against the City of Chicago ("the City") and Chicago police officers Sergeant Laura Griffin ("Defendant Griffin"), Officer Maureen Boyle ("Defendant Boyle"), and Officer John Velez ("Defendant Velez")[1] for violations of his Fourth and Fourteenth Amendment rights. (R. 33, Am. Compl.) Defendants move for partial summary judgment on certain claims contained in the complaint. (R. 44, Mot.) For the reasons set forth below, the motion is granted.

## RELEVANT FACTS

The facts herein are undisputed unless otherwise stated. On June 9, 2013, at approximately 3:11 a.m., a woman called 911 and reported that a man had just pointed a gun at her. (R. 57, Defs.' Reply to Facts ¶ 6; *see also* R. 53-2, Tr. of 911 Call.) She gave her location as Pulaski and Flournoy streets in Chicago, Illinois. (R. 57, Defs.' Reply to Facts ¶ 7.) She stated that the man had driven off in a vehicle, which she described as a gold Mitsubishi truck with the license plate number of R388356. (*Id.* ¶ 8.) This information was disseminated over the police dispatch radio through a "flash message," which is in essence an "emergency message" or "all-

---

[1] The individual defendants are referred to collectively herein as "Defendant Officers." The Defendant Officers and the City are referred to collectively as "Defendants."

points bulletin." (*Id.* ¶ 9; *see also* R. 53-2, Tr. of Police Dispatch; R. 53-1, Peete Dep. Tr. at 29.) Officers Brian Peete and Daniel Linsner (who are not parties to this lawsuit) were dispatched to interview the 911 caller. (R. 57, Defs.' Reply to Facts ¶ 10.) A few minutes later it was reported over the police radio that the gold Mitsubishi was being driven by a male with dreadlocks and that there was a female passenger in the vehicle.[2] (R 53-2, Tr. of Police Dispatch; R. 57, Defs.' Reply to Facts ¶ 14.).

On that date and time, Defendants Velez and Boyle were on duty, partnered together, and driving in a marked Chicago Police Department ("CPD") patrol vehicle near the intersection of Pulaski and Flournoy. (*Id.* ¶ 15.) Their vehicle was equipped with an in-dash camera that recorded events occurring in front of their vehicle, commonly referred to as a "dash-cam video." (*See* R. 53-2, Dash-Cam Video.) Defendant Griffin was also on duty at that time and was driving in a marked CPD patrol vehicle near the intersection of Pulaski and Flournoy. (R. 57, Defs.' Reply to Facts ¶ 16.) All three officers heard the radio dispatch giving the description and license plate number of the vehicle, as well as the dispatch providing a description of the vehicle's occupants. (*Id.* ¶ 17.)

At approximately 3:17 a.m., Defendants Boyle and Velez were driving southbound on Pulaski when they observed a gold Mitsubishi fail to stop at a red light at the intersection of Harrison and Pulaski. (*Id.* ¶ 18.) Plaintiff was driving the gold Mitsubishi in question, with his friend Christal Tanksley ("Tanksley") in the passenger seat. (*Id.* ¶¶ 80-83.) At the point when officers saw Plaintiff's vehicle, it was roughly six blocks from Pulaski and Flournoy, the intersection where the 911 call had originated. (*Id.* ¶ 19.) Defendants Boyle and Velez

---

[2] This information was not included in the original 911 call. (*See* R. 53-2, Tr. of 911 Call.) The exact source of the information is not clear from the present record, but it appears that Officers Linsner and Peete were on the scene shortly after the 911 call came in and that they interviewed eyewitnesses who provided the more detailed description of the occupants of the vehicle given in the second police dispatch. (*See* R. 53-6, Boyle Dep. Tr. at 283.)

recognized the vehicle description and license plate number from the radio dispatch, although the parties dispute whether they did so immediately or within a few minutes. (*Id.* ¶ 21.) Defendant Velez activated the police vehicle's overhead lights to conduct a traffic stop of the Mitsubishi. (*Id.* ¶ 22.) Plaintiff did not immediately stop but instead turned right onto Fifth Avenue and continued westbound.[3] (*Id.* ¶ 23.) Defendant Griffin happened to be traveling eastbound on Fifth Avenue and saw the gold Mitsubishi coming towards her. (*Id.* ¶ 25.) She attempted to pull in front of it to cause it to stop, but Plaintiff swerved around her, drove through a stop sign, and then pulled over just past the intersection of Fifth and Karlov. (*Id.* ¶¶ 26-27.) These events were captured on the dash-cam video from Defendant Velez's vehicle.[4] (R. 53-2, Dash-Cam Video.)

After getting out of their vehicles, Defendants Griffin and Velez approached the driver's side of the Mitsubishi and Defendant Boyle approached the passenger's side. (R. 57, Defs.' Reply to Facts ¶ 28.) Because the 911 call involved a report of a firearm, Defendants Griffin and Boyle had their weapons drawn as they approached the vehicle, but Defendant Velez did not. (*Id.*

---

[3] Plaintiff denies this fact without explicitly denying that he drove through a red light or failed to stop at a stop sign. (R. 53, Pl.'s Resp. to Facts ¶ 23.) Instead he offers various explanations for his actions, including that he "mistook the light at Fifth Ave. as applying to him" when he was on Pulaski, and that he did not immediately pull over when Defendant Velez activated his police lights because "he wasn't sure whether the police were trying to get him to pull over or to go around him." (*Id.*) He states that it took him "about 12 seconds to determine that the lights were for him." (*Id.*) He offers similar explanations in response to Defendants' facts listed at paragraphs 24, 26, and 27, without providing evidence to directly undercut the Defendant Officers' versions of events. (*See id.* ¶¶ 24, 26, and 27.) Plaintiff's subjective explanations do not undercut the defense's version of events, and Plaintiff's vehicle can clearly be scene on the dash-came video disobeying a stop light, swerving around Defendant Griffin's police vehicle, and disobeying a stop sign before pulling over. He also admits elsewhere in the record that he committed traffic violations that evening. (*See* R. 53-3, Moore Dep. Tr. at 18; R. 53, Pl.'s Resp. to Facts ¶ 66.) Therefore, the Court deems each of these facts admitted.

[4] The dash-cam video capturing this incident has been submitted by the parties. (R. 53-2, Dash-Cam Video.) For unknown reasons the camera did not record any audio. (R. 57, Defs.' Reply to Facts ¶ 97.) Plaintiff finds the lack of audio suspicious, but he has not provided any evidence to suggest that Defendants tampered with or otherwise engaged in intentional wrongdoing in connection with the video. The record reflects that there were various technical reasons why the audio function may not have worked. (*See* R. 53-9, Becvar Dep. Tr. at 90-92.) Plaintiff also makes much of the fact that the video stops after approximately 16 minutes while the doors of Plaintiff's vehicle were open and police officers were still on the scene. (*See* R. 57, Defs.' Reply to Facts ¶¶ 99-102.) But the key events related to the traffic stop were all captured on video, and there is no evidence to suggest that the officers purposely turned the video off to hide any improper conduct. Rather, it appears that the video stopped because Defendants Velez and Boyle (the officers whose vehicle was equipped with the camera) were leaving the scene while another officer stayed until the towing of Plaintiff's vehicle was completed. (R. 53-6, Boyle Dep. Tr. at 197-99.)

¶ 29.) As the officers approached, Defendant Griffin saw Plaintiff make a movement inside the vehicle but could not see whether he was holding anything in his hands. (*Id.* ¶ 31.) Plaintiff denies that he was making any "furtive" or "suspicious" gestures, (*id.* ¶ 32), but he admitted at his deposition that as the officers approached he was looking for his driver's license in a compartment to the right of his steering wheel. (R. 53-3, Moore Dep. Tr. at 143-45.) Plaintiff did not have time to find his license because he was "ordered to put [his] hands back on the steering wheel," which he did. (R. 53-3, Moore Dep. Tr. at 145.) Because of Plaintiff's movements, Defendant Griffin called out, "He's reaching," to the other officers. (R. 57, Defs.' Reply to Facts ¶ 32.) Defendant Velez then ordered Plaintiff out of his vehicle. (*Id.* ¶ 33.) The officer opened the door and Plaintiff got out on his own. (*Id.* ¶ 34.) After Plaintiff was out of the vehicle, Defendant Velez performed a pat-down of Plaintiff to check for weapons. (*Id.* ¶ 35.) Plaintiff was informed that he was under arrest, and Defendant Velez placed him in handcuffs. (*Id.* ¶ 37.) Plaintiff was then taken to a police vehicle. (*Id.* ¶ 39.) A more thorough search of his person was conducted, and a substance suspected to be narcotics was found in one of his socks. (*Id.* ¶ 44.)

During this same period, Defendant Boyle was interacting with Tanksley, the passenger of the car. (*Id.* ¶ 36.) She, too, was ordered out of the car, placed in handcuffs, and then taken to a police vehicle. (*Id.* ¶¶ 39, 45.) Once both Plaintiff and Tanksley were in handcuffs, Defendants Griffin and Boyle holstered their weapons. (*Id.* ¶ 40.) Shortly thereafter, the Defendant Officers, as well as two additional officers who had arrived on the scene, searched Plaintiff's vehicle. (*Id.* ¶ 41.) During the search, narcotics packaging was discovered in Plaintiff's vehicle.[5] (*Id.* ¶ 43.)

---

[5] In response to this fact Plaintiff states—without any citation to the record—"Plaintiff admits the testimony is correctly cited, but denies that it is undisputed." (*See* R. 57, Defs.' Reply to Facts ¶ 43.) It is unclear what this means. The Local Rules require Plaintiff to specifically reference supporting material when objecting to a statement of fact. N.D. ILL. L.R. 56.1(b)(3)(B); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). He has not complied with this Rule or pointed to any evidence that would support his denial. Accordingly, the Court deems this fact admitted.

4

The police claim that they recovered a firearm from Plaintiff's glove box. (*Id.* ¶ 90; R. 53-8, Velez Dep. Tr. at 9.) Plaintiff admits to having an interaction with a group of women at the location given by the 911 caller on the night in question,[6] (*Id.* ¶ 65), and also admits committing the traffic violations captured by the dash-cam video. (*Id.* ¶ 66.) He denies, however, that he brandished a gun at the women or had a gun in his vehicle. (*Id.* ¶ 90.) Given the location of the camera and the quality of the dash-cam video, it cannot be discerned what, if anything, the officers found during their search of Plaintiff's vehicle. (*See* R. 53-2, Dash-Cam Video.)

After Plaintiff and Tanksley were arrested, Plaintiff's vehicle was impounded, and he and Tanksley were both transported to the 11th District police station. (R. 57, Defs.' Reply to Facts ¶ 47; R. 53-3, Moore Dep. Tr. at 247-48.) While they were at the station, Tanksley gave the officers a statement describing the incident that led to the 911 call. (R. 57, Defs.' Reply to Facts ¶¶ 53-58.) She told a detective at the station that Plaintiff had pulled a firearm from his glove box during an altercation with a group of women near the intersection of Pulaski and Flournoy. (*Id.* ¶ 58.) During her deposition in this case, Tanksley testified that she did not actually see Plaintiff with a gun, and claimed that she made this statement to police because a female officer (someone other than the detective) accused her of lying when she said she did not see a gun and threatened to charge her as an accessory; she testified that after being held at the police station for several hours she "got tired" and wanted to leave. (R. 53-5, Tanksley Dep. Tr. at 90, 103-04.) She admitted that no one at the station told her she could not leave unless she gave a particular statement, that no one told her to lie, and that no one promised her anything if she gave a

---

[6] According to Plaintiff's testimony, he and Tanksley were out that night looking for a "female to have a threesome with." (R. 53-3, Moore Dep. Tr. at 115.) He stopped when he saw a "crowd of females" near the intersection of Pulaski and Flournoy who appeared to be drinking and "[h]aving a good time." (*Id.* at 116-17.) He was speaking with one of the women through the passenger side window when another woman came up and threw her drink on Plaintiff and Tanksley. (*Id.* at 118.) Plaintiff testified that he swore at the woman and "tried to give chase" when she ran off, but then realized he could not catch her. (*Id.* at 120-23.) He testified that he "cursed out" the woman's friends and then drove off. (*Id.* at 124-25.)

particular statement. (*Id.* at 143-44.) Tanksley also acknowledged that she repeated her statement to a prosecutor while she was at the station and never told the prosecutor that her statement was untrue. (R. 57, Defs.' Reply to Facts ¶ 56.)

While Plaintiff and Tanksley were at the police station, the officers completed an arrest report reflecting that Plaintiff was arrested for disobeying a stoplight, disobeying a stop sign, possession of between 2.5 and 10 grams of cannabis, and unlawful use of a weapon. (R. 53-6, Boyle Dep. Tr. at 212-15.) Sometime during this process, Officers Peete and Linsner—the two officers who had been assigned to investigate the 911 call—arrived. (R. 57, Defs.' Reply to Facts ¶ 94; R. 53-1, Peete Dep. Tr. at 40, 52, 55.) The officers had been unsuccessful in locating the victim, but had spoken with several eyewitnesses, including a man who gave them his name and contact information. (R. 53-1, Peete Dep. Tr. at 33-35, 45-47.) The man reported that a black male had been speaking with a group of women at Pulaski and Flournoy when "words were exchanged" and the male punched one of the females in the face. (*Id.* at 46.) According to the eyewitness, the black male then "reached into the glove box . . . and removed a handgun," pointed it at one of the women and then drove away. (*Id.* at 47.) The eyewitness gave a description and license plate number of the vehicle, which matched Plaintiff's vehicle. (*Id.*) He also gave police the name and phone number of the victim, but they were unsuccessful in reaching her. (*Id.* at 39.) There were women at the scene who confirmed the male eyewitness's account, but they would not provide their identifying information to the officers. (*Id.* at 50-51.)

Plaintiff was formally charged with several offenses in connection with this incident. Because of a prior felony conviction he had for armed robbery—and for which he was on parole at the time of this incident—he was charged with unlawful use of a weapon by a felon. (*See* R. 53-3, Moore Dep. Tr. at 221, 233-35.) He was also charged with possession of cannabis. (*Id.* at

221-23.) During the criminal proceedings, Plaintiff moved to suppress the gun police claimed to have recovered from this vehicle. (R. 57, Defs.' Reply to Facts ¶ 67.) Following a hearing, the judge ruled in his favor and suppressed the gun. (*Id.*) At the suppression hearing, neither the 911 call nor the dash-cam video were introduced into evidence.[7] (*Id.* ¶ 68.) The criminal charges against Plaintiff were ultimately dropped through a *nolle prosequi* plea by the prosecution. (*Id.* ¶ 67.) Nevertheless, Plaintiff's parole was revoked and he spent an additional 13 months in prison. (R. 53-3, Moore Dep. Tr. at 227-28, 295.) Plaintiff sought review of this decision with the parole board, but the board informed him that "[t]here was enough information in the police report and notice of charges to violate your parole only, not convict you of a crime, which is up to the Court." (R. 53-3, Moore Dep. Tr. at 227-28.)

Plaintiff claims that he had a run-in with Defendant Boyle prior to the June 2013 traffic stop. (R. 57, Defs.' Reply to Facts ¶ 71.) Specifically, he claims that sometime in May 2013, he was driving a different vehicle near his home at 742 S. Kedvale Avenue in Chicago, when Defendant Boyle and an unknown officer assigned as her partner began following him in their police vehicle. (*Id.* ¶¶ 72-73.) He claims that Defendant Boyle activated her lights and pulled him over, ordered him out of his vehicle and conducted a pat-down search, including checking his pockets. (*Id.* ¶¶ 74-75.) Plaintiff claims that he asked Defendant Boyle why he had been stopped and she responded that she pulled him over because he "looked like a drug dealer." (*Id.* ¶ 76.) Plaintiff claims that he cursed at Defendant Boyle and "went on a rant" because he was angry about the stop. (R. 53-3, Moore Dep. Tr. at 60-61.) After Plaintiff continued to pressure Defendant Boyle for some explanation for the stop, she allegedly responded, "If you don't like it, do something about it." (R. 57, Defs.' Reply to Facts ¶ 77.) Plaintiff claims that upon finding no

---

[7] There is some suggestion in the record that the dash-cam video originally could not be located, and that it was only discovered later during the course of this lawsuit. (*See* R. 53-6, Boyle Dep. Tr. at 236; R. 53-8, Velez Dep. Tr. at 34-35.) The record does not reveal why the prosecution did not introduce the 911 call at the suppression hearing.

weapons and no other reason to hold him, Defendant Boyle let him go.[8] (*Id.* ¶ 78.) Defendant

Boyle has no recollection of this incident, of following or stopping Plaintiff's vehicle in May

2013, or of ever seeing Plaintiff before his June 2013 arrest. (R. 53-6, Boyle Dep. Tr. at 289.)

## PROCEDURAL HISTORY

In August 2014, Plaintiff filed a *pro se* complaint challenging his arrest and the search of

his vehicle. (R. 1, Compl.) The Court granted his request for appointment of *pro bono* counsel,

and counsel subsequently filed an appearance on his behalf.[9] (R. 5, Order; R. 6, Att'y

Appearance.) In June 2015, counsel filed an amended complaint on Plaintiff's behalf raising six

separate counts. (R. 33, Am. Compl.) In Count I, Plaintiff alleges that Defendants subjected him

to an "unlawful seizure" in violation of the Fourth Amendment during the traffic stops occurring

in May 2013 and June 2013. (*Id.* ¶¶ 36-41.) In Count II, Plaintiff alleges unlawful search under

the Fourth Amendment against all Defendants based on each of these traffic stops. (*Id.* ¶¶ 42-48.)

In Count III, Plaintiff alleges false arrest under the Fourth Amendment against all Defendants

based on his arrest in June 2013. (*Id.* ¶¶ 49-54.) In Count IV, Plaintiff alleges that all Defendants,

acting together, conspired to violate his constitutional rights. (*Id.* ¶ 56.) In Count V, he raises a

"failure to intervene" claim alleging that "[o]ne or more of the Defendants had a realistic

opportunity to intervene and prevent the violation of [his] Constitutional rights, but stood by and

failed to do so." (*Id.* ¶ 61.) In Count VI, he raises an indemnification claim against the City

pursuant to 745 ILL. COMP. STAT. 10/9-102 based on the fact that the City employed the police

officers involved in these events. (*Id.* ¶¶ 65-67.)

---

[8] Plaintiff further testified that approximately a week after the May 2013 incident, he saw Defendant Boyle driving in her police vehicle when he was going for a run in the neighborhood. (R. 53-3, Moore Dep. Tr. at 85.) He claimed that he "gave her the middle finger" and that she slowed down to look at him but continued driving. (*Id.* at 89.)

[9] The Court wishes to thank attorneys Margaret A. Gisch and Matthew P. Bachochin and the law firm of Golan & Christie LLP for ably serving as appointed counsel in this case.

Defendants now move for summary judgment on Counts I, II, and VI solely as they relate to the June 2013 traffic stop, and on Counts III, IV, and V in their entirety. (R. 44, Mot. at 1.) Plaintiff filed an opposition to the motion,[10] (R. 55, Pl.'s Mem.), and Defendants filed a reply in support of their motion. (R. 56, Defs.' Reply).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the

---

[10] Defendants complain that Plaintiff filed a timely response to the motion and then filed a "corrected" response containing additional arguments one day past the deadline set by the Court. Defendants ask that the corrected response be stricken. (*See* R. 56, Defs.' Reply at 2-3.) Plaintiff should have sought leave to file this document, but given the very minimal delay and the lack of any identifiable prejudice to Defendants (as well as the fact that Plaintiff's attorneys are graciously serving by appointment in this case), the Court declines to strike the corrected response. The Court accepts this document (R. 55) as the operative responsive filing from Plaintiff.

nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (internal quotation marks and citation omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). In addition, not every factual dispute will defeat summary judgment, because "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

In deciding a motion for summary judgment, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). In other words, "summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249). Nevertheless, summary judgment is appropriate when a video clearly refutes the non-movant's version of events. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Felton v. City of*

*Chicago*, --- F.3d ---, 2016 WL 3536642, at *3 (7th Cir. June 28, 2016) (observing that summary judgment is appropriate if a police video "clearly contradicts" the plaintiff's account).

## ANALYSIS

Defendants move for summary judgment on Counts I, II, and VI solely as they relate to the June 2013 traffic stop, and on Counts III, IV, and V in their entirety. (R. 44, Mot. at 1.) The Court addresses each count below.

### I.     Counts I and III

Because Plaintiff's June 2013 arrest is the focal point of the amended complaint, the Court begins with Plaintiff's false arrest claim. In Count III, Plaintiff alleges that the Defendant Officers "restrained and arrested [him] without probable cause and without having reasonable grounds to believe that [he] had committed an offense." (R. 33, Am. Compl. ¶ 50.) Relatedly, in Count I, Plaintiff alleges that he was subject to an unreasonable seizure in violation of the Fourth Amendment in connection with the traffic stop. (*Id.* ¶ 38.)

Probable cause to arrest is an absolute defense to a Fourth Amendment claim for false arrest. *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). "Probable cause means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)) (internal quotation marks omitted). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). In addition, "an arrest is reasonable under the Fourth Amendment so long as there is probable cause

to believe that *some* criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect." *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010) (emphasis in original); *see also Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) (observing that "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause" (emphasis in original)).

In his response to the motion, Plaintiff concedes that there was probable cause for his arrest, given that he can be viewed on the dash-cam video committing various traffic offenses. (*See* R. 55, Pl.'s Mem. at 2 n.1.) He further concedes that the video defeats his false arrest claim. (*Id.*) This concession is well-taken. *See Scott*, 550 U.S. at 380; *see also Williams*, 809 F.3d at 942 ("[I]t is not a violation of the Fourth Amendment to arrest an individual for even a very minor traffic offense." (citation and internal quotation marks omitted).)

Although Plaintiff does not offer a direct concession as to Count I—the "unlawful seizure" claim—this claim fails for the same reason: The law is clear that Plaintiff's commission of traffic offenses would provide a proper basis for the officers to stop Plaintiff and order him out of the vehicle. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *see also Maryland v. Wilson*, 519 U.S. 408, 412 (1997) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures."). Thus, to the extent Count I challenges the Defendant Officers' decision to pull Plaintiff over and order him out of his vehicle, it too is unavailing.

12

Although it is not entirely clear from the complaint, Plaintiff may also be claiming that the seizure was unlawful because the officers should not have had their guns drawn as they approached his vehicle. (R. 33, Am. Compl. ¶¶ 24, 25, 36-38.) This is in essence an excessive force claim, which must be analyzed under the objective reasonableness standard of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394 (1989); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861 (7th Cir. 2010). An officer's use of force is considered unreasonable only if "judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (citation omitted). In making this determination, the Court must consider "the specific circumstances of the arrest, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Cyrus*, 624 F.3d at 861 (quoting *Graham*, 490 U.S. at 396).

The Court must also bear in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving" regarding the amount of force that is necessary in a given situation. *Ryburn v. Huff*, 132 S. Ct. 987, 992 (2012); *see also Cyrus*, 624 F.3d at 861 (observing that "law-enforcement officers must make critical, split-second decisions in difficult and potentially explosive situations"). Thus, the Court must "evaluate the reasonableness of the officer's actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Cyrus*, 624 F.3d at 862 (quoting *Graham*, 490 U.S. at 396). In addition, because "the Fourth Amendment analysis is objective," an officer's subjective intentions "do not matter." *Felton*, 2016 WL 3536642, at *2;

*see also Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force[.]").

Even construing the facts in the light most favorable to Plaintiff, the record shows that the officers acted reasonably under the circumstances. The undisputed facts show that at the time of this incident, police had received a 911 call reporting that a man had just pulled a gun on a woman. (R. 57, Defs.' Reply to Facts ¶ 6.) Roughly five minutes later and a short distance away, the officers saw the exact vehicle described by the 911 caller down to the license plate number. (*Id.* ¶¶ 7-8, 15-21.) They personally observed the vehicle run a red light. (*Id.* ¶ 18.) They attempted to execute a traffic stop, but the driver did not immediately pull over and instead continued to drive (at least a short distance), committing another traffic violation. (*Id.* ¶¶ 23-27.) As the officers approached the vehicle, Defendant Griffin (the highest-ranking officer on the scene) saw Plaintiff make a movement to the right of his steering wheel. (*Id.* ¶ 31.) She called out to the other officers that Plaintiff was "reaching," because she viewed this as concerning. (*Id.* ¶ 32; R. 53-7, Griffin Dep. Tr. at 103-08, 216-23.) Although Plaintiff denies that he was doing anything suspicious, his deposition testimony makes clear that his hands were off the steering wheel, at least briefly, while he was looking for his driver's license in a compartment to the right of the wheel. (*See* R. 53-3, Moore Dep. Tr. at 145.) The officers approaching the vehicle could not have known Plaintiff's subjective intentions and could reasonably find his actions suspicious in light of the other information known to them. *See United States v. Walton*, ---- F.3d ----, 2016 WL 3568062, at *5 (7th Cir. June 30, 2016) ("[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play." (citation omitted)). Given the circumstances, the Court concludes that the officers did not act unreasonably in drawing their weapons as they

approached Plaintiff's vehicle. *See United States v. Smith*, 697 F.3d 625, 632 (7th Cir. 2012)

(officer brandishing gun while conducting an investigatory stop of the suspect in an armed

robbery did not act unreasonably); *United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005)

(officers acted reasonably in approaching suspect's vehicle with guns drawn where there was

reason to believe that the suspect might be armed).

In addition, the Court has viewed the dash-cam video multiple times, and it does not,

under any reasonable interpretation, depict unduly aggressive use of weapons by the officers in

effectuating Plaintiff's arrest. *See Scott*, 550 U.S. at 380. Rather, the officers with their weapons

drawn can be seen standing at some distance from the vehicle. Defendant Velez, the officer

standing closest to Plaintiff, did not have his weapon drawn and instead simply ordered Plaintiff

out of the vehicle. Plaintiff then got out of the vehicle on his own. (R. 53-2, Dash-Cam Video.)

The parties agree that the officers holstered their weapons as soon as Plaintiff and his passenger

were in handcuffs. (R. 57, Defs.' Reply to Facts ¶ 40.) Even construing the record in Plaintiff's

favor, he has not established a Fourth Amendment violation. For these reasons, Defendants are

entitled to summary judgment on Count III in its entirety, and on Count I to the extent it is based

on the June 2013 traffic stop.

## II.    Count II

In Count II, Plaintiff alleges that he was subjected to an unlawful search in violation of

the Fourth Amendment. (R. 33, Am. Compl. ¶¶ 42-48.) Given the way the amended complaint is

drafted, it is not entirely clear if Plaintiff is challenging the search of his person that occurred

during the June 2013 traffic stop, the search of his vehicle, or both. (*See id.*) But any claim

challenging the search of Plaintiff's person would fail, because he concedes that the officers had

probable cause to arrest him for traffic offenses. (*See* R. 55, Pl.'s Mem. at 2 n.1.) A search

incident to a lawful arrest is permissible under the Fourth Amendment. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."); *United States v. Williams*, 209 F.3d 940, 943 (7th Cir. 2000) ("Searches incident to arrests are valid in order to find weapons and to search for and seize any evidence on the arrestee's person in order to prevent concealment and to preserve evidence for trial.").

Even absent Plaintiff's concession regarding the traffic violations, this Court would conclude that the police had probable cause to arrest him for assault with a firearm.[11] Again, probable cause means facts and circumstances that are "sufficient to warrant a prudent person" to believe that an individual "has committed, is committing, or is about to commit an offense." *Hill*, 818 F.3d at 294. This determination is an objective one "made without regard to an officer's motive, but with an eye toward additional knowledge the officer may have had as a result of his training and experience." *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 2044 (2016). "Probable cause does not require legal certainty, nor does it demand that all the facts in the officer's possession point in only one direction." *Zappa v. Gonzalez*, 819 F.3d 1002, 1005 (7th Cir. 2016). When presented with a credible report of criminal activity by eyewitnesses, a police officer may rely on the information provided to make an arrest "without having to conduct an independent investigation into their accounts." *Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013). "It does not matter . . . whether the accused person denies the allegations." *Askew v. City of Chi.*, 440 F.3d 894, 895 (7th Cir. 2006).

---

[11] Under Illinois law, the crime of aggravated assault occurs when a person engages in conduct which places another in reasonable apprehension of receiving a battery and uses a firearm in the course of the offense. 720 ILL. COMP. STAT. 5/12-1, 5/12-2(c)(1).

In essence, police are permitted to "arrest [the suspect] and let prosecutors and courts determine who is telling the truth." *Id.*

In this case a female 911 caller reported that a man had just pulled a gun on her. (R. 57, Defs.' Reply to Facts ¶¶ 6-8.) She gave a detailed description of the vehicle he was driving, including the make, model, color, and license plate number. (*Id.*) Given the nature of the report, police had a need to act quickly in responding to the call. *See United States v. Drake*, 456 F.3d 771, 774 (7th Cir. 2006) (recognizing "the particular duty of police officers to speedily respond to emergency situations reported by individuals through the 911 system"). Within minutes and mere blocks from where the call originated, Defendants Boyle and Velez spotted a vehicle exactly matching the description given by the caller. (*Id.* ¶¶ 18-21.) The vehicle's occupants also matched the report they were given. (*Id.* ¶ 14.) The officers personally observed the vehicle committing traffic violations, and the driver did not immediately pull over when they activated their lights to conduct a traffic stop. (*Id.* ¶¶ 18, 26.) The driver was then observed making some type of movement to the right of his steering wheel as the officers approached. (*Id.* ¶ 31; R. 53-3, Moore Dep. Tr. at 143-44.) The short amount of time that elapsed between the 911 call and when the officers spotted Plaintiff's vehicle reasonably suggested that if the 911 call was accurate, Plaintiff had a firearm inside his vehicle. The police were thus faced with a situation involving two individuals inside a vehicle late at night with possible access to a firearm, which posed a potential danger to them and anyone else in the area.

Based on the totality of the circumstances, the Court finds that the police acted reasonably in arresting Plaintiff when he exited his vehicle.[12] *See Askew*, 440 F.3d at 895-96 (police had probable cause to arrest the plaintiff for making an armed threat even though he denied the allegation, where 911 caller reported that a "black man driving a maroon car had pulled a gun," police saw the plaintiff's car matching that description a short distance away, he was parked in a manner that constituted a traffic violation, and a search of his person turned up a knife); *see also United States v. Booker*, 579 F.3d 835, 839 (7th Cir. 2009) ("When the police believe that a crime is in progress (or imminent), action on a lesser degree of probability, or with fewer procedural checks in advance, can be reasonable." (citation omitted)). Because Plaintiff was lawfully arrested—for traffic infractions, assault with a firearm, or both—the police were permitted to conduct a search of his person incident to that arrest. *See Robinson*, 414 U.S. at 235.

The search of Plaintiff's vehicle must be analyzed separately. "Warrantless searches are per se unreasonable under the Fourth Amendment unless they fall within 'a few specifically established and well-delineated exceptions.'" *Charles*, 801 F.3d at 860 (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). One such exception is the "automobile exception," which "permits the police to search a vehicle if there is probable cause to believe it contains evidence of criminal activity." *Id.* "The authority to search encompasses any area of the vehicle where evidence of the crime might be found." *Id.* Thus, "if there is probable cause to search a vehicle for contraband or evidence of a crime, a police officer may search containers within the vehicle that could hold

---

[12] When Officer Linsner and Peete responded to the 911 call, a second individual confirmed the caller's account and also provided the officers with both his and the 911 caller's contact information. (R. 57, Defs.' Reply to Facts ¶¶ 12-13.) Although this further bolsters the reliability of the call, the Court did not consider these facts because, as Plaintiff points out, it is not clear from the record that this information was known by the arresting officers at the time of Plaintiff's arrest. *See Bruce v. Guernsey*, 777 F.3d 872, 878 (7th Cir. 2015) (observing that the Fourth Amendment analysis turns solely on facts known to the police at the time of their actions). For the same reason, the Court has not given any consideration to the post-arrest statements made by Tanksley in determining whether there was probable cause for Plaintiff's arrest.

such evidence." *Id.* Probable cause for the search can be based on any suspected criminal activity, not simply the offense for which the individual was actually arrested. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014).

There is a separate exception that permits police to search a vehicle incident to the arrest of one of its occupants, but "only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant*, 556 U.S. at 351 (emphasis added). The automobile exception and the so-called "*Gant* exception" are "interrelated, but not identical." *Edwards*, 769 F.3d at 514. The *Gant* exception is directly "tied to an arrest," whereas the automobile exception is not. *Id.* Additionally, the *Gant* exception permits a search only if it is reasonable to believe the vehicle contains evidence of the offense of arrest, whereas the automobile exception permits a search whenever there is probable cause to believe the vehicle contains contraband or evidence of criminal activity.[13] *Id.*

The Court concludes that the facts and circumstances known to the Defendant Officers would lead a reasonably prudent person to believe that Plaintiff's vehicle contained contraband or evidence of a crime. As stated above, the police received a 911 call from a woman stating that a man had just pulled a gun on her. (R. 57, Defs.' Reply to Facts ¶¶ 6-7.) She described his vehicle down to the license plate number and provided a detailed description of the vehicle's occupants. (*Id.* ¶ 8.) Plaintiff's vehicle was seen by police minutes later and only a few blocks from the location given by the 911 caller. (*Id.* ¶¶ 18-19.) The vehicle and its occupants matched the description given. (*Id.*) The police personally witnessed the vehicle committing traffic

---

[13] The Seventh Circuit has noted that *Gant* did not clearly delineate "whether the 'offense of arrest' is limited to the crime for which the defendant was 'actually arrested' or includes other crimes that the officer had probable cause to believe occurred." *Edwards*, 769 F.3d at 515. In the Seventh Circuit's view, "Justice Scalia's concurrence in *Gant* suggests both would qualify." *Id.* (citing *Gant*, 556 U.S. at 353 (Scalia, J., concurring)).

violations, including running a red light—a potentially dangerous infraction—and the driver failed to immediately pull over when police attempted to conduct a traffic stop. (*Id.* ¶¶ 18-27.) As the officers approached, Plaintiff was seen making a movement to the right of his steering wheel. (*Id.* ¶ 31.) Although Plaintiff offers various explanations for his actions, from an objective standpoint his actions could be viewed as suspicious. In addition, a valid search of Plaintiff's person incident to his arrest revealed suspected narcotics hidden inside one of his socks. (*Id.* ¶ 44.)

Based on the circumstances, the Court concludes that police had probable cause to believe that Plaintiff's vehicle contained a firearm, drugs, or related contraband or evidence of criminal activity.[14] *See Charles*, 801 F.3d at 861 (officers had probable cause to search vehicle for a gun where they were responding to a dispatch report directing them to look for "a person with a gun" in a particular alley in response to a 911 call, they saw the plaintiff only a few minutes after the report, and plaintiff matched the description given of the suspect); *Smith*, 697 F.3d at 629-30 (police had probable cause to search vehicle for a gun or other evidence of criminal activity, where an armed bank robbery had just occurred, the occupants matched the description of the suspects, and as the officers approached the vehicle attempted to speed off); *see also United States v. Payne*, --- F. App'x ---, 2016 WL 3648261, at *3-4 (7th Cir. July 8, 2016) (police had probable cause to search defendant's vehicle for a firearm under the automobile exception where they had prior knowledge that defendant might have guns in his vehicle, and he was observed engaging in potentially suspicious behavior, including reaching toward the backseat of his vehicle and fleeing from police).

---

[14] Plaintiff makes a brief argument that his arrest "was merely a pretense" to justify the search of his vehicle, which in his view makes the search improper. (R. 55, Pl.'s Mem. at 10.) Arguments about "pretext" are "misplaced in the Fourth Amendment context." *Edwards*, 769 F.3d at 516. "The reasonableness of a search does not depend on the officer's subjective motivations; the inquiry is, of course, *objective.*" *Id.* (emphasis in original).

As to the *Gant* exception, the record shows that Plaintiff and his passenger were both handcuffed and sitting inside police vehicles at the time his vehicle was searched, so that the first part of the *Gant* exception would be inapplicable. *See Gant*, 556 U.S. at 351 (permitting search of vehicle where arrestee was "within reaching distance of the passenger compartment at the time of the search"). But the Court has concluded that the police had probable cause to arrest Plaintiff for assault with a firearm, and for the reasons already outlined, it was reasonable for them to believe that Plaintiff's vehicle contained evidence pertaining to that offense, *i.e.*, the firearm. *See id.* (permitting search where it is "reasonable to believe the vehicle contains evidence of the offense of arrest"). The search of Plaintiff's vehicle was thus permissible under the Fourth Amendment. For these reasons, Defendants are entitled to summary judgment on Count II to the extent it challenges the June 2013 traffic stop.

### III.   Counts IV and V

In Counts IV and V, Plaintiff alleges claims for conspiracy and failure to intervene. (R. 33, Am. Compl. ¶¶ 55-64.) In the conspiracy count, which is directed to "All Defendants," Plaintiff alleges that "Defendants, acting together and under color of law, reached an understanding and agreement, engaged in a course of conduct and otherwise conspired among and between themselves" to violate Plaintiff's constitutional rights. (*Id.* ¶ 56.) In the failure-to-intervene count, which is also directed against "All Defendants," Plaintiff alleges in general terms that "[o]ne or more of the Defendants had a realistic opportunity to intervene and prevent the violation of [his] Constitutional rights, but stood by and failed to do so." (*Id.* ¶ 61.) Plaintiff does not clearly delineate whether these claims are premised on the May 2013 stop, the June 2013 stop, or both, although he incorporates by reference the allegations describing both incidents. (*See id.* ¶¶ 55, 60.)

To the extent these counts are based on the June 2013 traffic stop, the Court agrees with Defendants that they fail under the applicable law. Claims of conspiracy require an underlying constitutional violation to be viable. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."); *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (observing that "there is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution," and thus jury verdict for the defendants on the plaintiff's false arrest and malicious prosecution claims "foreclose[d] relief on the conspiracy claim" (citation omitted)); *Kola v. Vill. of Harwood Heights*, No. 13-cv-08923, 2014 WL 4057370, at \*5 (N.D. Ill. Aug. 14, 2014) ("[B]ecause the Court finds that there was probable cause and therefore no constitutional violation, the conspiracy claim under federal law necessarily fails as well.").

The same rule applies to a claim for failure to intervene. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]"); *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) ("Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention."). Because Plaintiff has failed to prove an underlying constitutional violation in connection with the June 2013 traffic stop, his conspiracy and failure-to-intervene claims based on this incident also fail.

Defendant does not believe that Plaintiff adequately alleged in the complaint that these claims were also based on the May 2013 traffic stop, but assuming he did, such claims find no support in the record. Plaintiff purports to bring his conspiracy and failure-to-intervene claims against all Defendants, but he has not presented evidence that any Defendant Officer other than

Defendant Boyle was present during the May 2013 traffic stop.[15] Police officers who were not present on the scene cannot be held liable for failing to intervene in another officer's unconstitutional acts. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (holding that failure-to-intervene claim requires plaintiff to show that an officer was "present" and had a "realistic opportunity to intervene to prevent the harm from occurring"); *cf. Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (denying summary judgment where it was undisputed that the two defendants charged with failing to intervene "were mere feet away . . . while the conduct in question occurred"). Nor can this Court discern (and Plaintiff has not explained) how Defendant Boyle could be held liable for failing to "intervene" in her own alleged constitutional violations.

Similarly, as to the conspiracy claim, Defendant Boyle cannot be held liable for "conspiring" to violate Plaintiff's rights by herself. *See United States v. Penny*, 60 F.3d 1257, 1262 (7th Cir. 1995) (conspiracy requires an agreement between at least two people); *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988) (conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means" (citation omitted)). There is no evidence in the record to show that Defendants Griffin and Velez conspired with Defendant Boyle to violate Plaintiff's rights in connection with the May 2013 incident. Without some tangible evidence to support his conspiracy claim, Plaintiff

---

[15] In his deposition testimony, Plaintiff made a vague reference to a male officer being present during the alleged traffic stop occurring in May 2013. (*See* R. 53-3, Moore Dep. Tr. at 54.) However, he has not provided any evidence to link this incident to a named Defendant other than Defendant Boyle. Defendant Boyle testified that she was partnered with Officers Jordan Poulis and Richard Reimer during May 2013, (R. 53-6, Boyle Dep. Tr. at 45-54), and Plaintiff has not pointed to any evidence in the record to refute this, nor has he named these individuals in this lawsuit.

cannot proceed to trial on this claim.[16] *Sterk*, 770 F.3d at 627; *see also Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013) (granting summary judgment for defendants where "[o]nly speculation and conjecture could result in a finding that the defendants conspired to deprive [plaintiff] of her rights"). Therefore, Defendants are entitled to summary judgment on Counts IV and V in their entirety.

## IV.    Count VI

Finally, in Count VI, Plaintiff seeks indemnification from the City under 745 ILL. COMP. STAT. 10/9-102 based on the actions of the Defendant Officers. (R. 33, Am. Compl. ¶¶ 65-67.) The Court agrees with Defendants that the indemnification claim fails as to the June 2013 traffic stop, because Plaintiff has failed to establish any wrongdoing by the Defendant Officers in connection with this incident. Illinois law explicitly provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILL. COMP. STAT. 10/2-109; *see also Vill. of Bloomingdale v. CDG Enters., Inc.*, 752 N.E.2d 1090, 1100 (Ill. 2001) ("[S]ection 2-109 provides that a local public entity is not liable where its employee is not liable."); *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 320 (Ill. App. Ct. 2006) (claims against municipality were moot where its police officers were not liable for Fourth Amendment violation). Therefore, Defendants are entitled to summary judgment on Count VI to the extent it is based on the June 2013 traffic stop.

---

[16] Plaintiff argues in passing that the "blatant disregard for General and Special Orders" supports his conspiracy claim. (R. 55, Pl.'s Mem. at 14-15.) He does not elaborate, but the Court surmises that he is referring to Defendant Boyle's alleged failure to comply with a police special order requiring that a "contact card" be completed when an officer conducts a traffic stop but does not make any arrest or issue a traffic citation. (*See* R. 55, Pl.'s Mem. at 4.) However, the special order he points to in support of this argument has an effective date of January 2015. (R. 53-10, Special Order S04-13-09.) The incident he is complaining about allegedly occurred in May 2013, almost two years earlier. This document thus falls far short of raising a genuine issue for trial. To the extent Plaintiff is referring to general or special orders governing in-dash cameras, those arguments relate to the June 2013 traffic stop and are addressed in footnote 2, *supra*.

What remains of this case at this point are Plaintiff's unlawful search and seizure claims (Counts I and II) arising from the May 2013 incident with Defendant Boyle, and his claim seeking indemnification from the City (Count VI) based on the May 2013 incident. Plaintiff's allegations underlying these claims detail a very brief encounter with a CPD officer wherein he was pulled over, patted-down, and released. (R. 33, Am. Compl. ¶¶ 13-19.) As the incident is recounted by Plaintiff, it would appear to involve very minimal damages. Defendant Boyle has no recollection of this incident occurring, (R. 53-6, Boyle Dep. Tr. at 152, 290), and Plaintiff has apparently been unable to uncover documentary evidence proving that Defendant Boyle actually executed a traffic stop of his vehicle during May 2013. (*See* R. 57, Defs.' Reply to Facts ¶ 79.) Given the dramatically altered scope of this lawsuit and the nature of the claims that remain at this point, the Court urges the parties to reevaluate their settlement positions and to exhaust all efforts to settle the remainder of this case.

## CONCLUSION

For these reasons, Defendants' motion for partial summary judgment (R. 44) is GRANTED. The Court enters judgment in favor of Defendants on Counts III, IV, and V in their entirety, and on Counts I, II, and VI to the extent they are based on the traffic stop occurring on June 9, 2013. The parties shall appear for a status hearing on August 31, 2016, at 9:45 a.m.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: July 21, 2016**